IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATHANIEL MITCHELL                :
                                  :               CIVIL ACTION
        v.                        :
                                  :               NO. 14-5026
COMMUNITY EDUCATION               :
CENTERS, INC.                     :

## MEMORANDUM

**SURRICK, J.**                                           **MAY 2, 2016**

Presently before the Court is Defendant's Motion for Summary Judgment (ECF No. 42).

For the following reasons, the Motion will be granted.

## I.      BACKGROUND

This is an employment discrimination action under Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., and the Pennsylvania Human Relations Act

("PHRA"), 42 Pa. Stat. § 951, *et seq*.  Plaintiff Nathaniel Mitchel brought multiple claims against

Defendant Community Education Centers, Inc. ("CEC") related to his termination from the

George W. Hill Correctional Facility (the "Prison") in March of 2013.  Plaintiff, a corrections

officer at the Prison, contends that he was terminated on account of his race.  Many of Plaintiff's

claims were dismissed at the motion to dismiss stage.[1]  The claims that survived and are subject

to this Motion for Summary Judgment include (1) race discrimination under Title VII and the

PHRA; (2) hostile work environment under Title VII and the PHRA; and (3) retaliation under

Title VII and the PHRA.

---

[1] Plaintiff's claims that were dismissed include:  wrongful termination, breach of
contract, unjust enrichment, negligence, gross negligence, common law harassment, and
emotional distress.  (*See* August 11, 2015 Mem. and Order, ECF Nos. 19, 20.)

### A.    Factual Background[2]

Plaintiff is African American.  He began employment at CEC as a corrections officer in January 2009.  (Offer Ltr., Pl.'s Resp. Ex. 8; Mitchell Dep. 27, Def.'s Mot. Sum. J. Ex. A.)  It was around that time that CEC began operating the George W. Hill Facility.  (Clement Dep. 14, Pl.'s Resp. Ex. 4.)  As a corrections officer, Plaintiff was responsible for supervising inmates, among other things.  (Def.'s Mot. Sum. J. Ex. G.)  Plaintiff had worked the third shift at the Prison for approximately five years prior to his termination in March of 2013.  (Mitchell Dep. 68.)

On January 9, 2013, Plaintiff and another corrections officer, Mark Stroud, were observed sleeping while on duty.  (January 9, 2013 Disciplinary Form, Def.'s Mot. Sum. J. Ex. H; February 4, 2013 Memorandum of Understanding ("MOU"), Def.'s Mot. Sum. J. Ex. I.)  Stroud is Caucasian.  (Clement Dep. 22.)  At the time, Plaintiff and Stroud were assigned to supervise an inmate during the third shift at the Delaware County Memorial Hospital.  (Feb. 4 MOU.)  The officers were observed sleeping by both a nurse and a security officer.  (Jan. 9 Disciplinary Form; Feb. 4 MOU.)  Sleeping while on duty is a terminable offense under the Collective Bargaining Agreement ("CBA") that governed Plaintiff's employment with the CEC.  (*See* CBA, Def.'s Mot. Sum. J. Ex. E; *see also* Mitchell Dep. 51.)[3]

---

[2] We view of all of the facts and draw all reasonable inferences therefrom in the light most favorable to Plaintiff, the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

[3] Section 13.05 of the CBA sets forth CEC's progressive disciplinary process, which provides that when an employee violates company rules, policies or practices, the CEC may issue a verbal warning,  a written warning, a suspension or final warning, and/or a notice of termination of employment.  (CBA § 13.05.)  The CBA also states that certain violations "are grounds for immediate termination upon first offense" and that termination "may occur even in the absence of any prior history of disciplinary action."  (*Id*. at § 13.04.)  These violations include "sleeping on the job" and "falsification of the application for employment or other

Plaintiff was placed on administrative suspension pending the results of an investigation into the incident.  (*Id*.)  While Defendant was conducting its investigation, Plaintiff's union contacted Defendant and requested that Plaintiff and Stroud be issued suspensions instead of being terminated.  (*Id*.)  Karin Clement, Vice President of Plaintiff's Union, intervened on behalf of Plaintiff and Stroud.  (Clement Dep. 22-23.)  Ultimately, the Warden at the prison, Cameron Lindsay, agreed to suspend the officers in lieu of terminating them, so long as it was pursuant to a "last chance agreement."  (*Id*.)  On February 4, 2013, Defendant and the Union entered into a MOU, which is also known as the last chance agreement.  (*Id*.; Feb. 4 MOU.)  Pursuant to the MOU, Defendant agreed to a "one time exception" for Plaintiff and Stroud "from the dictates of the [CBA]" and from the Prison's "established past practice of terminating each and every employee observed sleeping while on duty."  (Feb. 4 MOU.)  Plaintiff and Stroud received a warning and thirty-day suspension instead of termination.  (*Id*.)  In addition, the MOU placed Plaintiff and Stroud on a one-year probation.  The MOU states that, in exchange for this one time exception, "the next disciplinary action [Plaintiff] receives for any infraction . . . within twelve (12) months of the conclusion of [his] thirty (30) day suspension will result in his discharge." (*Id*.)  There is no dispute that Officer Stroud and Plaintiff received the same treatment, discipline, and reinstatement as a result of this disciplinary action.  (Mitchell Dep. 122; Clement Dep. 23.) On February 15, 2013, disciplinary action forms were issued to Plaintiff and Stroud, which reflected the terms of the MOU.  (Def.'s Mot. Sum. J. Exs. H, J.)  The forms issued to these two officers are identical.  (*See id*.)

---

official document."  (*Id*.)  Sleeping on the job is a terminable offense, and employees found guilty of it are not provided the benefit of the progressive disciplinary policy.  (Fernandez Dep. 37, Pl.'s Resp. Ex. 1; Byrne Dep. 45, Pl.'s Resp. Ex. 2; Clement Dep. 46; Lindsay Dep. 58-59, Pl.'s Resp. Ex. 12.)

Less than a month after the MOU was entered into, and while he was on probation, Plaintiff was again cited for violating the CBA.  Specifically, Defendant determined that on February 27, 2013, Plaintiff falsified an official document in violation of § 13.04 of the CBA. Plaintiff was working the third shift at the time of the incident.  (Mitchell Dep. 85.)  When he entered and exited the secure area of the facility to take his break, he signed the names "Pablo Escobar" and "Fidel Castro" on the Ion Scan log sheet instead of signing his own name.  (March 4, 2013 Investigation Mem., Def.'s Mot. Sum J. Ex. K.)  The Prison uses an Ion Scan machine to scan employees and detect for the presence of narcotics.  (Beese Dep. 24-25, Pl.'s Resp. Ex. 3.) The Ion Scan machine is turned off during the third working shift in order to reboot.  (Beese Dep. 24-25.)  In order to keep track of employees entering and leaving the secure portion of the Prison during this time, Defendant maintains an Ion Scan log on the counter by the Ion Scan machine for employees to sign.  (*Id.* at 24-26; Mitchell Dep. 86-108.)  During the third shift, a corrections officer is present at the Ion Scan log to assure employees sign the log, and to pat down individuals coming through the secured area.  (Mitchell Dep. 44.)

On Thursday, February 28, 2013, during his review of the prison paperwork for the previous day, Investigations Supervisor Keith Hayward noticed that the Ion Scan log contained the names Pablo Escobar and Fidel Castro, in addition to signatures of other staff members. (Mar. 4 Investigation Mem.)  Hayward reported the incident to prison administration, and Defendant launched an investigation.  (*Id.*)  Plaintiff denies signing the names Pablo Escobar and Fidel Castro to the Ion Scan log, and insists that he signed his name to the log both when he entered and when he exited the secure area of the Prison.  (*Id.*; Pl.'s Grievance Form, Def.'s Mot. Sum. J. Ex. Q.)  When Investigator Donald Beese interviewed Plaintiff and asked him why his name was not on the Ion Scan log for February 27, 2013, Plaintiff offered varied explanations.

4

(Mar. 4 Investigation Mem.)  First, Plaintiff stated that he signs his name different ways, and believed that his signature was on the same Ion Scan log that also contained Pablo Escobar and Fidel Castro.  (*Id*.)  Plaintiff later told Investigator Beese that there were two Ion Scan logs at the sign-in desk that evening, and that he must have signed the other one.  (*Id*.)  Karin Clement, Plaintiff's union representative, was present during Investigator Beese's interview of Plaintiff. (*Id*.)

As part of his investigation, Investigator Beese interviewed Officer Maurice Brown, who was assigned as the Ion Scan Officer during the third shift on February 27, 2013.  (*Id*.)  Officer Brown identified Plaintiff as the officer who wrote Pablo Escobar and Fidel Castro on the Ion Scan log.  (*Id*.; Beese Dep. 53, 55; Brown Aff. ¶¶ 8-11, 14, Def.'s Reply Ex. A.)  Officer Brown also indicated that there was only one Ion Scan log at the desk on the evening in question. (Beese Dep. 74; Brown Aff. ¶ 5.)  In his Affidavit, Officer Brown stated that when Plaintiff signed the Ion Scan log the second time, he was accompanied by corrections officer Michelle Forkay.  (Brown Aff. ¶ 10.)  According to Officer Brown, Plaintiff and Officer Forkay were both laughing after Plaintiff signed the Ion Scan log.  (*Id*.)  Officer Brown submitted a written statement that was included in Investigator Beese's investigatory file for the incident.  (Mar. 4 Investigation Mem.; Beese Dep. 15.)  Officer Brown is African American.  (Beese Dep. 74.)

Investigator Beese also interviewed corrections officer Michelle Forkay two days after the incident.  (Beese Dep. 14, 75-76; Mar. 4 Investigation Mem.)  Officer Forkay, an African American, stated that she did not recall any of the events of that evening.  (Beese Dep. 76-77.) Investigator Beese believed that Officer Forkay was lying about her failed memory.  (*Id*.) Officer Forkay also submitted a written statement to Officer Beese, which indicated that she did not recall anything that occurred on the evening of February 27.  (Mar. 4 Investigation Mem.)

5

The written statements for both Officer Forkay and Officer Brown were misplaced.  Officer

Beese testified that he searched through the investigatory file and could not locate these

statements.  (Beese Dep. 15.)[4]

As part of the investigation, surveillance video taken of the area containing the Ion Scan

machine and log was reviewed and two excerpts were recorded.  (Beese Dep. 18; DVD

Surveillance, Def.'s Mot. Sum. J. Ex. M (on file with Court).)  In the two excerpts, Plaintiff is

observed signing an Ion Scan log while exiting the secure area at 3:15 am, and then again signing

the Ion Scan log while entering the area at 3:45 am.  (Beese Dep. 50-51.)[5]  Based on the

interviews of Plaintiff, Officer Brown, and Officer Forkay, and based on his review of the

surveillance video, Investigator Beese concluded that Plaintiff violated the CBA by falsifying an

official document. (Beese Dep. 59-60; Mar. 4 Investigation Mem.)  Investigator Beese

summarized his investigation and findings in the March 4 Investigatory Memorandum directed to

Warden Cameron Lindsay.  (Mar. 4 Investigation Mem.)  Under the CBA, falsifying an official

document is grounds for immediate termination.  (CBA § 13.04; Fernandez Dep. 37; Byrne Dep.

45; Clement Dep. 46; Lindsay Dep. 59.)  The Prison considers the Ion Scan log to be an official

---

[4] Plaintiff argues that Defendant's failure to maintain the written statements from two eye-witnesses, Officer Brown and Officer Forkay, constitutes spoliation of evidence.  Plaintiff requests that a negative inference be drawn from the absence of this evidence.  We address this argument *infra* at Section III.A.1.

[5] Plaintiff challenges Defendant's production of only the excerpts of the surveillance showing Plaintiff's exit from, and entry into, the secure area.  Plaintiff claims that the entire eight-hour portion of the surveillance should have been produced in discovery.  Plaintiff argues that a spoliation inference should be drawn as a result of Defendant's failure to produce the entire video.  However, as Investigator Beese testified, only portions of the surveillance were recorded.  (Beese Dep. 18-20.)  When Investigator Hayward reviewed the surveillance video, he only recorded those portions that he thought were relevant to the investigation.  (*Id.*)  Plaintiff's spoliation argument is addressed *infra* at Section III.A.1.

document.  (Clement Dep. 45-46; Byrne Dep. 34; Beese Dep. 30.)  Plaintiff does not dispute this.

(Mitchell Dep. 206, 208.)

On March 4, 2013, Plaintiff was placed on administrative suspension.  (Def.'s Mot. Sum.

J. Ex. N.)  On March 5, 2013, a disciplinary action form was issued to Plaintiff, which states:

> After review of the George W. Hill Correctional Facility paperwork from
> February 27, 2013, it was determined that someone placed/printed the names
> PABLO ESCOBAR and FIDEL CASTRO on the ION-SCAN Completed Log.  It
> appears that both names were placed at separate times.  Surveillance would show
> Officer Nathaniel Mitchell writing something on the logs at 0315 hrs and 0345
> hrs.  Through the investigation and interviews it was determined that Officer
> Mitchell stated that he signed the log in sheet, but could not locate his signature.
> Officer Mitchell stated his signature varies at times.  Officer Mitchell also stated
> that he did not place the names Pablo Escobar or Fidel Castro on the log in sheet.
> It has been determined that Officer Mitchell lied during the interview about
> signing his name on the log sheet.  Officer Mitchell also lied about placing the
> names:  Pablo Escobar and Fidel Castro on the ION-SCAN Sheet, thus falsifying
> an official document.

(March 4, 2013 Disciplinary Form, Def.'s Mot. Sum. J. Ex. O.)  On March 5, 2013, Defendant

sent Plaintiff a letter, notifying him that he was terminated as a result of violating CBA

§ 13.04(d).  (Def.'s Mot. Sum. J. Ex. P.)

On March 10, 2013, Plaintiff filed a grievance with Warden Lindsay.  (Pl.'s Grievance

Form.)[6]  In his grievance, Plaintiff continued to deny writing Pablo Escobar and Fidel Castro on

the Ion Scan log, indicating again that there were two log-in sheets and that he signed his name

accurately on one of them.  (*Id.*)  On March 11, 2013, Warden Lindsay denied Plaintiff's

grievance by a letter directed to Plaintiff.  (March 11, 2013 Ltr.)  The letter states:

---

[6] The CBA contains a formal grievance process.  (CBA § 11.)  After a corrections officer
is discharged, he or she may seek a grievance within seven days of the discharge.  (*Id.* at § 11.3.)
If the Warden denies the grievance, the termination becomes final.  (Fernandez Dep. 38-39;
Clement Dep. 18-20.)  Once a grievance is denied, the Union Board is provided the employee's
discharge file, conducts an independent investigation, and decides whether to arbitrate the
corrections officers' termination.  (Clement Dep. 18-19; Fernandez Dep. 38-39.)

A close review of the facts in this matter reveals that there was only one sign-in sheet that you could have signed; video-evidence demonstrated that staff who came before and after you had signed their names on the same sheet, yet your name was not on the same sign-in sheet. Furthermore, a sworn-statement was obtained that confirmed what had already been learned via the review of the video-evidence.

In final analysis, I find that there is absolutely no reason to overturn the decision to terminate your employment with the company. Although I had misgivings about doing so, you were nevertheless given a last chance to improve your behavior for another recent, serious act of misconduct which compromised our security and embarrassed the facility in general.

(*Id.*)

After being denied the grievance, Plaintiff contacted his union multiple times, requesting that they arbitrate his termination. (Mitchell Dep. 66-67; 124-25.) Union Vice President Clement led the independent investigation to determine whether the union would arbitrate Plaintiff's termination on Plaintiff's behalf. (Clement Dep. 85-86.) As part of that investigation, the union reviewed the investigatory file prepared by Beese and reviewed the surveillance video. (*Id.*) In addition, the union spoke with Officer Brown directly, who confirmed that there was only one Ion Scan sheet, and that Plaintiff wrote Pablo Escobar and Fidel Castro on it. (*Id.* at 53-54; 86-87.) Upon Plaintiff's insistence that there were two Ion Scan sheets, the union attempted to locate the second sheet and was unsuccessful. (*Id.*) Based upon its investigation, the seven-member union board voted to not arbitrate Plaintiff's termination on Plaintiff's behalf. (*Id.* at 66-68.) The union board based their decision on all of the evidence that supported Plaintiff's termination. (*Id.*)

### B.    Procedural History

On August 12, 2014, Plaintiff filed a Complaint in the Court of Common Pleas of Delaware County. (Compl., Notice of Removal Ex. A., ECF No. 1.) On August 29, 2014, Defendant filed a notice of removal to this Court.

On August 12, 2015, the Court granted in part and denied in part Defendant's motion to dismiss.  (ECF Nos. 19, 20.)  On August 14, 2015, the Court granted Defendant's motion for sanctions.  (ECF No. 21.)  Sanctions were awarded as a result of a frivolous motion to remand filed by Plaintiff, who conceded that this Court retained original jurisdiction over the matter as a result of federal claims asserted in the complaint, yet nevertheless filed the motion to remand.  (*Id*.)

On September 10, 2015, a scheduling order was entered after a pretrial conference held in Chambers.  (ECF No. 24.)  The scheduling order set January 8, 2016 as the deadline to complete fact discovery.  (*Id*.)  The Court granted the parties' joint request for a one-month extension of the discovery deadline.  (ECF No. 37.)  Ten days after discovery closed and just two days before dispositive motions were due, Plaintiff filed a motion to compel discovery responses.  (ECF No. 40.)  The motion was denied on March 4, 2016.  (ECF No. 44.)

On February 29, 2016, Defendant filed the instant Motion for Summary Judgment.  On March 14, 2016, Plaintiff filed a Response in opposition to the Motion.  On March 18, 2016, Defendant filed a Reply.  On March 30, 2016, Plaintiff filed a Sur-Reply.  (Pl.'s Sur-Reply, ECF No. 48.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  "[A] factual dispute is material only if it might affect the outcome of the suit under

governing law." *Id*. The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 461 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III. DISCUSSION

Defendant seeks summary judgment on Plaintiff's remaining claims: race discrimination, hostile work environment, and retaliation under Title VII and the PHRA. Defendant contends that Plaintiff has failed to put forth evidence sufficient to establish a prima facie case with respect to each claim. Plaintiff responds that the evidence establishes that his termination was the result of race discrimination. Plaintiff also requests that judgment be entered in his favor

under Federal Rule of Civil Procedure 56(f)(1).  Finally, Plaintiff seeks an adverse inference

based upon Defendant's alleged spoliation of evidence, and contends that Defendant's

"manipulation" of evidence is in and of itself evidence of purposeful discrimination.

### A.    Race Discrimination Claims

Plaintiff contends that his termination as a corrections officer from CEC is unlawful

under Title VII because it was based on racial animus.  Title VII makes it unlawful "to fail or

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  Generally, courts analyze

discrimination claims in which direct evidence of discrimination is lacking under the *McDonnell*

*Douglas* burden-shifting paradigm.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802,

(1973).  Under this three-part analysis, Plaintiff must first establish a prima facie case of

discrimination by a preponderance of the evidence.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789,

797 (3d Cir. 2003).  If he succeeds, the burden shifts to Defendant to "articulate some legitimate,

nondiscriminatory reason" for Plaintiff's termination.  *Id.* (quoting *McDonnell Douglas*, 411

U.S. at 802).  If Defendant meets this burden, Plaintiff must establish by a preponderance of the

evidence that Defendant's proffered reasons are a pretext for discrimination.  *Id.* (citations

omitted).[7]

### 1.    *Prima Facie Case*

To establish a prima facie case of race discrimination, Plaintiff must show that (1) he

belongs to a protected class; (2) he is qualified for the position; and that (3) CEC subjected him

---

[7] Because the analysis for claims brought under the PHRA is identical to the analysis under Title VII, we need not address Plaintiff's PHRA claims separately.  *See Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013).

to an adverse employee action; (4) under circumstances giving rise to an inference of

discrimination.  *Sarullo*, 352 F.3d at 797.  The requirements of the prima facie standard are

"flexible," *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999), and an inference

of discrimination "could be supported in a number of ways, including . . . comparator evidence,

evidence of similar racial discrimination of other employees, or direct evidence of discrimination

from statements or actions by [his] supervisors suggesting racial animus," *Golod v. Bank of Am.*

*Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010).

The parties do not dispute that Plaintiff has met the first three prongs of his prima facie

case.  He belongs to a protected class, was qualified as a corrections officer, and was subjected to

an adverse employment action:  he was terminated.  Our analysis will therefore focus on the

fourth prong—whether the evidence surrounding Plaintiff's termination gives rise to an inference

of discrimination.  To establish this element of the prima facie case:

> a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly
> situated employees who (a) were not members of the same protected class and (b)
> were treated more favorably under similar circumstances); or (2) rely on
> circumstantial evidence that otherwise shows a causal nexus between his
> membership in a protected class and the adverse employment action.

*Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing

*Sarullo*, 352 F.3d at 797 n.7).  Plaintiff argues that an inference of discrimination is shown both

by circumstantial evidence and through the use of comparators.

With regard to circumstantial evidence, Plaintiff contends that an inference of

discrimination is shown by the fact that Defendant "has systematically eliminated black

corrections officers from its ranks since 2009, reducing the population of black corrections

officers from 80% to 20% by 2013."  (Pl.'s Resp. 1.)  To support this assertion, Plaintiff points to

allegations in the Complaint, and to an affidavit of Roslynn Simmons.  This proffer is

insufficient.  Plaintiff may not simply rely on the Complaint at that summary judgment stage.

Instead, he must point to specific facts in the record to support his claims.  *See* Fed. R. Civ. P.

56(c).  In any event, Plaintiff's own testimony contradicts his statistical argument.  Plaintiff

testified that when he left the Prison in 2013, the racial makeup of corrections officers was

approximately 50% Caucasian and 50% African American.  (Mitchell Dep. 151.)

       The affidavit of Roslynn Simmons is also insufficient.  That affidavit was not even

offered in Plaintiff's case, but was instead offered at summary judgment in another

discrimination case brought against CEC entitled *McWilliams v. Community Education Centers*,

No. 14-4783 (E.D. Pa.) (Kearney, J.).  In her affidavit, Ms. Simmons, a corrections officer, avers

that she made a list of 60 employees terminated within the first five months of 2009, when CEC

first took over management of the Prison, and that the list shows that 95% of the employees were

African American.  (Simmons Aff., Pl.'s Resp. Ex. 10.)  Even if it was appropriate for us to

consider an affidavit submitted in another case, this circumstantial evidence does not support an

inference of discrimination.  "In order to be useful in establishing a prima facie case, statistics

must assist the plaintiff in proving discrimination in h[is] particular case."  *Blue v. Def. Logistics*

*Agency*, 181 F. App'x 272, 274 (3d Cir. 2006) (citing *Krodel v. Young*, 748 F.2d 701, 710 (D.C.

Cir. 1984))  Ms. Simmons' statistics are not useful here, and Plaintiff's reliance on them is

misplaced.  They relate to events that occurred in 2009 and not 2013 when Plaintiff's termination

took place, and therefore do not show "a causal nexus" between Plaintiff's membership in a

protected class and his termination.  *See Greene*, 557 F. App'x at 195; *McWilliams v. Cmty.*

*Educ. Ctrs., Inc*., No. 14-4783, 2015 U.S. Dist. LEXIS 142816, at *19-20 (E.D. Pa. Oct. 21,

2015) (declining to "place any credence in McWilliams' repeated reliance on statistics, and

fellow officer Roslynn Simmons' Affidavit" because the plaintiff failed to draw a nexus between the statistics and his termination).

Plaintiff also contends that an inference of discrimination is shown by CEC's more favorable treatment of similarly situated Caucasian employees.  In order to demonstrate discrimination using comparator evidence, "comparator employees must be similarly situated in all relevant respects," the determination of which "takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in."  *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) (citations omitted); *see also McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) ("In this particular context—workplace disciplinary and/or personnel actions—relevant factors include a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000))).

Plaintiff points to five Caucasian employees at the Prison who were not terminated for engaging similar conduct—Joseph McCreary, Michael Boggs, Nicole Regan, Ryan Gifford, and Stephen Marek.  (Pl.'s Resp. 8; October 1 Investigative Rept., Pl.'s Resp. Ex. 6B.)  Plaintiff offers few facts to support the argument that the treatment of these officers gives rise to an inference of discrimination.  Plaintiff opted not to depose any of them, and failed to provide any details necessary for the Court to determine whether Defendant's treatment of them gives rise to an inference of discrimination.  Specifically, the record lacks specific evidence about the proposed comparators' supervisors, the standards to which they were held, the specific type of conduct in which they engaged, and the disciplinary action taken by Defendant against them.  In

14

fact, the only evidence about four of the five of these proposed comparators—McCreary, Boggs, Regan, and Gifford—is contained in an October 8, 2012 Investigative Report concerning an incident involving the use of force against an inmate.[8]  "It is not the Court's place to speculate on reasons that might undermine other employees' comparability, but it is Plaintiff's burden to identify them so that any determination whatsoever can be made as to their similarity."  *Mojica v. Advance Auto Parts, Inc.*, No. 15-1418, 2016 U.S. Dist. LEXIS 2890, at *17 (E.D. Pa. Jan. 11, 2016) (finding that the plaintiff failed to meet burden in proffering evidence about his proposed comparators).  The record lacks sufficient facts concerning these proposed comparator employees.

Based on the minimal facts we may glean from that October 8 Investigative Report, it is apparent that none of Plaintiff's proposed comparators are similarly situated to Plaintiff. McCreary and Gifford were Sergeants, not corrections officers like Plaintiff.  Therefore, we may presume, in the absence of any evidence to the contrary, that these officers did not deal with the same supervisor and were not subject to the same standards as Plaintiff.  *See Wilcher*, 441 F. App'x at 882 (concluding that proposed comparators were not similarly situated because they held different positions and assumed different job responsibilities than the plaintiff).  In addition, four out of the five officers engaged in conduct dissimilar to Plaintiff.  Boggs, Regan, McCreary, and Gifford were accused of giving false testimony or failing to completely or accurately report a use of force incident.  They were not accused of violating the CBA by falsifying an official document.  *See id.* (finding persuasive the fact that comparators "were subjected to disciplinary action for different types of misconduct" than the plaintiff).  According to the October 8

---

[8] Plaintiff complains that he was not provided requested discovery on these comparator officers, including the officers' personnel files.  However, Plaintiff's belated request to compel production of this discovery—which came after the discovery deadline and only days before the due date for dispositive motions—was nobody's fault but his own.

Investigative Report, Marek was found to have falsified an official document in violation of the CBA.  Marek was terminated for this violation; however, the record shows that he was later reinstated and his discipline was changed to a written warning.  Plaintiff contends that Marek's reinstatement, despite his violation of the same provision of the CBA, raises an inference of discrimination.  However, the fact that Marek was found to have falsified an official document, without more, does not make Marek an appropriate comparator.  The record lacks any evidence showing that Marek had a disciplinary history similar to Plaintiff, or that he was on probation at the time he violated the CBA.  The MOU that Plaintiff agreed to when he was reinstated after having been found sleeping while on duty provides that "any disciplinary action [Plaintiff] receives for any infraction . . . within twelve (12) months of the conclusion of [his] thirty day suspension will result in his discharge."  (Feb. 4. MOU.)[9]  Plaintiff has not provided any evidence that Marek was treated more favorably by being reinstated despite having violated the CBA while on probation.  Plaintiff has failed to meet his burden in establishing that Defendant treated other similarly situated people more favorably.

Finally, Plaintiff contends that his termination was a sham because nothing in the record supports a finding that Plaintiff wrote the names Pablo Escobar and Fidel Castro on the Ion Scan log.  Plaintiff argues that Defendant knew that Plaintiff was innocent, and to cover up exculpatory evidence proving his innocence, Defendant engaged in "evidence tampering" and spoliation of evidence.  As a result of this alleged "manipulation of evidence," Plaintiff requests

---

[9] In his Response, Plaintiff contends that his infraction for sleeping while on duty is inadmissible under Federal Rule of Evidence 404(b), and should not be considered by the Court in considering this Motion.  Rule 404(b) prohibits evidence of prior wrongs if offered to show that an individual acted in conformity therewith.  Plaintiff's request that we ignore evidence about his discipline for sleeping while on duty is both curious and frivolous.  The facts surrounding Plaintiff's suspension and later reinstatement for this infraction was described in detail in his Complaint.  This is not 404(b) evidence.  It is direct evidence related to the claims and defenses being asserted in this case.

an adverse inference and that judgment be entered in his favor.[10]  "Spoliation is a negative inference drawn from a party's destruction of relevant evidence, reflecting a 'consciousness of guilt.'"  *Ward v. Lamanna*, 334 F. App'x 487, 492 (3d Cir. 2009).  Sanctions are appropriate for spoliation when the party seeking sanctions can demonstrate that (1) the evidence was in the party's control, (2) the evidence was relevant, (3) there was "actual suppression or withholding of the evidence," and (4) "the duty to preserve the evidence was reasonably foreseeable to the party."  *Bull v. UPS, Inc*., 665 F.3d 68, 73 (3d Cir. 2012) (citing *Brewer v. Quaker St. Oil Ref. Corp*., 72 F.3d 326, 334 (3d Cir. 1995)).  Plaintiff, as the party seeking a spoliation sanction, bears the burden of proof as to each of these elements.  *Swindell Dressler Int'l Co. v. Travelers Cas. and Sur. Co*., 827 F. Supp. 2d 498, 505 (W.D. Pa. 2011).  If a district court finds that spoliation has occurred, it may determine what sanction is appropriate.  Plaintiff requests a negative inference as the appropriate sanction.

Plaintiff argues that Defendant engaged in spoliation in two ways.  First, Plaintiff states that Defendant failed to maintain a copy of the entire video surveillance footage, but instead only recorded excerpts showing Plaintiff signing the Ion Scan log.  Plaintiff contends that the footage of the entire shift may reveal that it was another employee and not Plaintiff who actually wrote Pablo Escobar and Fidel Castor on the Ion Scan log.  Second, Plaintiff states that Defendant's misplacement of the written statements of two of the eyewitnesses to the incident—Officer Brown and Officer Forkay—reveals Defendant's attempt to conceal relevant parts of the investigation and constitutes spoliation of evidence.  Plaintiff has not met his burden in demonstrating that Defendant is guilty of spoliation with respect to either of these types of evidence.  With regard to the video surveillance, Investigator Beese testified that as part of the

---

[10] Under Rule 56(f), the Court is authorized to grant summary judgment for a non-moving party.

investigation protocol, they only record those portions of surveillance that are relevant to the investigation. Once the investigators had an eye-witness—Officer Brown—identify Plaintiff as the employee who wrote the names, they determined that the excerpts of the video showing Plaintiff at the Ion Scan desk were the only relevant segments for recording. Defendant was under no duty to preserve the entire eight hours of the video surveillance. With regard to the written statements of Officer Brown and Officer Forkay, Plaintiff has also failed to meet his burden in demonstrating that a negative inference is an appropriate sanction. Officer Brown testified in his Affidavit that Plaintiff wrote the names Pablo Escobar and Fidel Castro on the Ion Scan log. He also informed Investigator Beese and the union representative of this. Brown never retracted his version of the incident, and there is no indication that his written statement, or the statement of Officer Forkay would offer anything exculpatory. Both Defendant and the union conducted a thorough investigation into the incident and both determined that Plaintiff wrote the names on the Ion Scan log. There is nothing in the record that supports finding that there was an actual suppression or purposeful withholding of evidence, or that the investigations were flawed in any way. Plaintiff's request for a negative inference must be denied. Based on the undisputed evidence, a reasonable jury would not find that Plaintiff has met his burden of establishing a prima facie case of race discrimination.

### 2.    *Legitimate Non-Discriminatory Reason and Pretext*

Even assuming *arguendo* that Plaintiff was able to make out a prima facie case, summary judgment is nevertheless appropriate. Plaintiff has failed to show that Defendant's proffered reason for terminating him—two terminable violations of the CBA occurring within one month of each other, one of which occurred while he was on probation—is pretext for intentional discrimination. Defendant's proffered reason for terminating Plaintiff was legitimate. After an

extensive investigation, Defendant concluded that Plaintiff violated a section of the CBA—

falsifying an official document—which is an immediately terminable offense.  Plaintiff was

found to have violated the CBA less than a month into his one-year probation, which he received

in exchange for being reinstated after having committed another immediately terminable

offense—sleeping while on duty.

In order to show pretext, Plaintiff must come forward with evidence "from which a

factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d

Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  Plaintiff fails to show

pretext under either approach.

Under the first approach—evidence permitting a factfinder to reasonably disbelieve

CEC's articulated reason—Plaintiff must show "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a jury

could "rationally find them unworthy of credence" or "infer that the employer did not act for [the

asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal quotation marks

omitted).  The record is devoid of any evidence, direct or circumstantial, that undermines

Defendant's legitimate reason for terminating Plaintiff.  Under the second approach to

establishing pretext, Plaintiff must point to evidence that would permit a jury to reasonably

believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action.  To show this, Plaintiff may present evidence that

the employer treated similarly situated comparators more favorably.  As we discussed with

respect to Plaintiff's prima facie case, Plaintiff has failed to identify any similarly situated

comparators.  Accordingly, summary judgment will be granted in favor of Defendant on

Plaintiff's race discrimination claim.

      **B.**      **Hostile Work Environment Claims**

To establish a prima facie case for hostile work environment, Plaintiff must establish (1)

that he suffered intentional discrimination because of his race; (2) the discrimination was severe

and pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would

detrimentally affect a reasonable person in similar circumstances; and (5) the existence of

respondeat superior.  *Mandel v. Q & M Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).  "To

determine whether an environment is hostile, a court must consider the totality of the

circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance.'"  *Id*. at 168 (citing *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 23 (1993)).

No reasonable jury could find that Plaintiff has established the elements of a hostile work

environment claim.  Similar to the race discrimination claim, Plaintiff has failed to establish that

he suffered intentional discrimination due to his race.  Plaintiff was terminated for violating the

CBA, after having already been reprimanded one month prior and given a "last chance" to stay

out of trouble.  Plaintiff addresses the hostile work environment claim in a few sentences in his

Sur-Reply.  With little explanation, Plaintiff contends that his prior disciplinary action for

sleeping on the job, which occurred shortly before his disciplinary action for falsifying an

official document, establishes both the severity and pervasiveness of the discrimination.  Plaintiff

seems to suggest that termination and suspension are severe employment actions.  Plaintiff's

argument reveals his misunderstanding about this element of the claim.  It is the conduct by

Defendant that must be severe and "create an abusive working environment," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986), and not the adverse employment action.  There is nothing severe about a Prison following its disciplinary protocol and taking corrective action against employees who violate their CBA and prison policies.  Plaintiff also argues that because he was disciplined twice within a short span of time, this establishes that the discrimination was pervasive.  (Pl.'s Sur-Reply 13 ("Throughout all of 2013 at least, the prison was engaged in a non-stop effort to terminate Officer Mitchell.  It was pervasive.").)  The record demonstrates that Plaintiff was reprimanded two times for violating the CBA for infractions that warrant immediate termination.  This does not constitute pervasive action, let alone pervasive discrimination.  Defendant's motion for summary judgment will be granted with respect to Plaintiff's hostile work environment claims.

### C.  Retaliation Claims

Title VII prohibits an employer from discriminating against an employee "because he has opposed any . . . unlawful employment practice" under Title VII, or because he has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pursuant to Title VII.  42 U.S.C. § 2000e-3(a); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).  To make out a prima facie case of retaliation, Plaintiff must prove (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) a causal connection between the protected activity and the employment action.  *Moore*, 461 F.3d at 340-41.  For purposes of the first element—that Plaintiff engaged in "protected activity"—"Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  *Peden v. Dist. Council 33 Local 696*, No. 14-

3045, 2015 U.S. Dist. LEXIS 127253, at *17 (E.D. Pa. Sept. 23, 2015).  While "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII," *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc*., 450 F.3d 130, 135 (3d Cir. 2006), grievances, formal or informal, relating to discriminatory conduct prohibited by Title VII will be protected, *Sung Tran v. Delavau LLC*, 615 F. Supp. 2d 381, 386 (E.D. Pa. 2009).

Defendant contends that Plaintiff has failed to make out a prima facie claim of retaliation because he has failed to point to any evidence showing that he engaged in a protected activity, and has failed to show a causal connection between his termination and that protected activity. Despite his lengthy Response and Sur-Reply, Plaintiff ignores entirely Defendant's arguments with respect to the retaliation claims.  Apparently Plaintiff has abandoned these claims.  In any event, the evidence does not support a prima facie case for retaliation.  The record is devoid of any evidence that Plaintiff participated in Title VII proceedings, or made grievances opposing discriminatory conduct.  In fact, Plaintiff testified that he never complained about discrimination to anyone at CEC.  (*See* Pl.'s Dep. 131-32; *see also id*. at 190 ("I never reported any racial type of discriminatory action.").)  By Plaintiff's own testimony, he did not engage in any protected activity sufficient to make out a retaliation claim.  Therefore, Defendant's Motion for Summary Judgment on the retaliation claims will be granted.

**IV.      CONCLUSION**

For the reasons discussed above, Defendant's Motion for Summary Judgment will be granted.  Judgment will be entered in favor of Defendant and against Plaintiff on Counts 8 through 13.

An appropriate Order follows.

BY THE COURT:


_/s/ R. Barclay Surrick_
**U.S. District Judge**